## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

JEANETTE MELLERSON       )
                             )
                             )
            Plaintiff,    )     Civil Action No.:  L-01-2090
                             )
v.                           )
                             )
JOANNE B. BARNHART,     )
Commissioner               )
Social Security Administration   )
                             )
           Defendant.   )

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S PETITION FOR AN AWARD OF ATTORNEYS' FEES AND COSTS

Jeanette Mellerson ("Ms. Mellerson" or "Plaintiff"), by counsel, hereby submits this Memorandum in support of her Petition for an Award of Attorneys' Fees and Costs for the work done by her counsel in successfully resolving her claims under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq. ("Title VII"), the Age Discrimination in Employment Act, as amended, 29 U.S.C. § 621 et seq. ("ADEA"), and the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 701 ("Rehabilitation Act").

I.      BACKGROUND

In late 1994, Ms. Mellerson, an employee of the Social Security Administration ("SSA"), was denied a promotion from a GS-5 to a GS-7 position while a less-qualified, non-disabled white male under forty was promoted in her place. In February 1995, Ms. Mellerson filed a timely administrative complaint for employment discrimination based on her nonpromotion. Ms.

Mellerson's complaint, through no fault of her own, weaved through the administrative process for more than six years.

Ms. Mellerson filed this lawsuit *pro se* against the SSA on July 17, 2001, using a one-page form provided by the Court.  Her Complaint alleged discriminatory nonpromotion based on race, age, gender and disability.

A.    Entry of Appearance by the Washington Lawyers' Committee for Civil Rights & Urban Affairs and Piper Rudnick LLP

After filing her Complaint, Ms. Mellerson contacted the Washington Lawyers' Committee for Civil Rights & Urban Affairs (the "Committee"), a D.C.-based 501(c)(3) nonprofit civil rights organization which represents individuals in the larger D.C. metropolitan area who cannot otherwise obtain legal representation from the private plaintiff's bar.  With the assistance of the Baltimore office of Piper Rudnick LLP ("Piper Rudnick"), the Committee investigated the merits of Ms. Mellerson's claim.  On May 6, 2002, the Committee and Piper Rudnick entered their appearances in this case as counsel for Plaintiff.

The first act of Plaintiff's counsel was to contact counsel to the SSA to request that it withdraw its premature motion for summary judgment, which had been filed before any discovery had occurred, and which was premised almost entirely on SSA's denial of discriminatory intent.  See Def's Motion to Dismiss or in the Alternative for Summary Judgment, Docket entry #10.  SSA refused, and, accordingly Plaintiff prepared and filed an opposition memorandum as well as a motion under Fed. R. Civ. P. 56(f).  On August 8, 2002, this Court dismissed SSA's motion as "premature" and granted Plaintiff's request for discovery.

Plaintiff's counsel then prepared a First Amended Complaint, for the purposes of narrowing and clarifying Plaintiff's claims.  Specifically, the Amended Complaint voluntarily

2

dismissed the gender discrimination claim, narrowed the disability discrimination claim and gave greater detail to the age and race discrimination claims. SSA, however, refused Plaintiff's request for consent to file the Amended Complaint, and thus on September 26, 2002, Plaintiff filed a motion, with supporting memorandum, for leave to file an amended complaint. The Court granted Ms. Mellerson's motion the same day it was filed.

B.    Discovery

Discovery began at the end of August 2002. Pursuant to Court order, Ms. Mellerson produced all documents in support of her claims, a list of witnesses in support of her claims, and a list of relevant health care providers, along with pertinent medical records, on August 28, 2002. She then propounded her own interrogatories and document requests on September 20, 2002. Defendant noticed Ms. Mellerson's deposition, which was taken on October 25, 2002.

On October 29, 2002 SSA served written responses to Plaintiff's discovery, which were grossly inadequate. Among other deficiencies, the document production stated that some of the most critical documents were either unavailable (*e.g.* Ms. Mellerson's personnel file) or destroyed (*e.g.* the key 1994 promotion file), or that vital discoverable information, *e.g.* complaints against Harold Brittingham (the supervisor responsible for Ms. Mellerson's non-selection), his decision-making history, and his personnel file, would not be provided. *See* Exhibit A. Equally deficient were SSA's interrogatory responses, in which SSA refused to provide substantive answers to many of Plaintiff's interrogatories, including interrogatories related to complaints and grievances against Mr. Brittingham and Mr. Brittingham's promotional decision-making history. *See* Exhibit B. Plaintiff was then forced to begin the process of challenging the sufficiency of Defendant's discovery responses. *See* Exhibit C.

Regarding non-paper discovery, Ms. Mellerson advised SSA that she intended to interview lower level, non-management employees who had relevant information, as permitted by Md. R. of Prof. Conduct 4.2. *See* Exhibit D; Exhibit E. Ms. Mellerson also noted the depositions of higher-level officials. However, SSA refused to allow access to the lower level witnesses and simultaneously refused to agree to more than ten depositions. *See* Exhibit F; Exhibit G. Consequently, a dispute arose over access to such witnesses, ultimately leading to a motion by Plaintiff for permission to exceed the presumptive limit of ten depositions. *See* Docket Entry #33. Plaintiff also confronted a threat by Defendant that despite Defendant's interrogatory response stating that Mr. Brittingham would testify about complaints against him, Defendant would instruct him during his deposition not to testify to such matters. *See* Exhibit H.

In sum, Ms. Mellerson engaged in discovery in good faith but was met at every turn with Defendant's refusal to provide crucial discovery documents or appropriate answers to interrogatories, refusal to provide access to key witnesses, and threats to instruct witnesses not to testify about discoverable information. At the end of October 2002, soon after SSA had deposed Ms. Mellerson and just as it became clear she intended to doggedly challenge SSA's discovery delinquencies, SSA requested the parties engage in mediation.

C.      Mediation/Settlement

Mediation occurred over several meetings and phone calls extending over a nine-month period from January through September 2003. During that time, Ms. Mellerson's attorneys not only drafted the standard mediation statement but also prepared billing information to facilitate the discussion of fees, provided research to support her compensatory damages claim, and drafted additional letters to explain these submissions. At the initial settlement conference on January 27, 2003, Defendant made a "final" settlement offer of $25,000. Ultimately, in October

4

2003, Defendant agreed to pay $46,618, which included not only Ms. Mellerson's back pay and compensatory damages but also her front pay for the duration of her expected lifespan.

This memorandum and accompanying motion is being filed in accordance with the Settlement Agreement, see Exhibit I at ¶¶ 6-7, and the Consent Order filed with this Court, in which Plaintiff must submit her attorneys' fees petition within 30 days of the mutual execution of the settlement agreement. Plaintiff's petition for an award of attorneys' fees and costs seeks $133,979 in attorneys' fees and $3,738 in costs. *See* Declaration of Susan E. Huhta, attached hereto as Exhibit J, and Declaration of Tracey Gann Turner, attached hereto as Exhibit K. Plaintiffs have exercised careful and extensive billing judgment to eliminate any time and costs that should not be compensated. As a result, a total of $129,421 in attorneys' fees and $1,000 in costs have been cut from Plaintiff's fee petition. The lodestar calculation supporting this request for attorneys' fees and expenses is described in this memorandum and detailed in the accompanying exhibits and declarations. The requested fee is very reasonable in light of the time and resources required to prosecute the case both before and through mediation. Therefore, as the prevailing party in this civil rights action, Plaintiff respectfully requests that the Court award her the full attorneys' fees and costs requested herein.

II.     ARGUMENT

Title VII was intended to allow plaintiffs to fully vindicate their civil rights, and Title VII's fee-shifting provision was designed specifically to assist and encourage plaintiffs in that effort. *See New York Gaslight Club, Inc., et al. v. Carey*, 447 U.S. 54, 63 (1980).[1] The legislative history of the fee-shifting provision reveals that Congress was "expressly

5

command[ing] the courts to use the broadest and most effective remedies" to effectuate the goals of the civil rights laws. *Northcross v. Board of Education*, 611 F.2d 624, 633 (6th Cir. 1979). As stated by the Supreme Court, if successful plaintiffs were forced to bear excessive costs of litigation, "few aggrieved parties would be in a position to advance the public interest by invoking the injunctive power of the federal courts." *Newman v. Piggie Park Enterprises,* 390 U.S. 400, 402 (1968).

Because legal services are expensive, Congress has mandated that the cost of vindicating civil rights be borne by the losing defendant. The civil rights laws "depend heavily on private enforcement;" therefore, "citizens must recover what it costs them to vindicate these rights in court." Sen. Rep. 2; House Rep. 1-3, U.S. Cong. Admin. News 1976, p. 5910, *quoted in Hensley v. Eckerhart*, 461 U.S. 424, 445 (1983). In passing the fee shifting statute, Congress had a dual purpose of "fully compensating prevailing parties for their attorneys' fees and encouraging attorneys to handle civil rights cases." *Daly v. Hill*, 790 F.2d 1071, 1078 (4th Cir. 1986). *See also Blum v. Stenson*, 465 U.S. 886, 897 (1984) (explaining congressional intent to compensate prevailing plaintiffs for attorneys' fees and costs and to attract competent counsel to these cases) (quoting S. Rep. No. 94-1011, p.6 (1976)).

A.    Ms. Mellerson is a Prevailing Party

Ms. Mellerson is entitled to attorneys' fees and costs because she is a "prevailing party" pursuant to the settlement agreement, which also provides for Plaintiff to submit a fee petition to the Court as contemplated by 42 U.S.C. § 2000e-16(d), 42 U.S.C. § 2000e-5(k) and 42 U.S.C. § 1988. The Settlement Agreement in this case provides that, for purposes of the fee petition,

---

[1] Such assistance enables plaintiffs not only to vindicate their own rights but also to serve as "'private attorney[s] general,' vindicating a policy that Congress considered of the highest priority." *Newman v. Piggie Park Enterprises,*

Ms. Mellerson is a prevailing party and, therefore, is entitled to recover attorneys' fees and costs. See Exhibit I at ¶ 7. Further, "[w]here a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee." *Hensley v. Eckerhart*, 461 U.S. 424, 435 (1983). Plaintiff has obtained such results in this case.

The minimum "prevailing party" status is achieved if plaintiffs "succeed on any significant issue in litigation which achieves *some of the benefit* the parties sought in bringing suit." *Hensley*, 461 U.S. at 433 (emphasis added). At the end of the first mediation session, SSA offered $25,000 to cover its valuation of back pay and a sum for compensatory damages. Through subsequent negotiations, Plaintiff successfully countered SSA's calculations regarding back pay as well as the low valuation of compensatory damages. Ms. Mellerson also continued to demand compensation for her future lost pay. Although not conceding the accuracy of Plaintiff's position, Defendant then raised its back pay/compensatory damages number to $30,000 and agreed to compensate for future economic loss. Ultimately, it offered an amount proposed as a bottom line by Plaintiff, *i.e.* $16,618. *See* Exhibit L at note 1.

As a result, Ms. Mellerson recovered back pay, front pay and compensatory damages[2] totaling $46,618, up from the Defendant's initial offer of $25,000. The final payment is substantial, especially in light of Ms. Mellerson's modest income. Moreover, the front pay accounts for lost income through the rest of Ms. Mellerson's life expectancy and the compensatory damages, *i.e.* $16,500,[3] are significant. Further, because the agreement provides for the separate litigation of attorneys' fees, Ms. Mellerson's substantial recovery will not be

---

390 U.S. 400, 402 (1968).

[2] Because punitive damages cannot be collected against the federal government, Plaintiff did not seek such damages in her complaint.

[3] The approximate difference between the final back pay/compensatory number, *i.e.* $30,000, and the amount allocated to back pay by Defendant, *i.e.* $13,542.

7

compromised by the payment of attorneys' fees. In this way, Ms. Mellerson obtained every type of damages to which she was entitled and every benefit sought other than injunctive relief, while avoiding the expense, time and risk of litigating the case through trial. These results well-exceed the benchmark for a claim of "prevailing party" status.

     B.     <u>Plaintiff's Requested Amount of Attorneys' Fees is Reasonable</u>.

Once it is determined that a plaintiff is a "prevailing party," the court must assess the reasonableness of the requested award of fees and expenses. Courts have repeatedly emphasized that "the district court has discretion in determining the amount of a fee award." *Daly*, 790 F.2d at 1078-79. This is appropriate "in view of the district court's superior understanding of the litigation and the desirability of avoiding frequent appellate review of what essentially are factual matters." *Id.* The Supreme Court has established a framework and methodology for calculating the amount of reasonable attorneys' fees to award a prevailing party. The calculation, a "lodestar," is based upon the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate. *See Hensley*, 461 U.S. at 433; *Lyle v. Food Lion*, 954 F.2d 984, 988 (4th Cir. 1992). In calculating the lodestar, the prevailing party should exercise billing judgment to exclude from the fee request hours that are duplicative or otherwise unnecessary. *See Hensley,* 461 U.S. at 434. The Fourth Circuit has emphasized that the lodestar represents a presumptively reasonable fee award. *See Buffington v. Baltimore County, Md.,* 913 F.2d 113, 127 n.11 (4th Cir. 1990).

The Supreme Court has expressly rejected the notion that attorneys' fees in civil rights cases should be proportionate to the amount of damages a plaintiff recovers. *See City of Riverside v. Rivera,* 477 U.S. 561, 574 (1986) (affirming award of $245,456 in attorneys' fees in a police misconduct case in which plaintiffs were awarded a total of $33,350 in damages); *see*

*also Fair Housing of Marin v. Combs*, 285 F.3d 899, 902 (9th Cir. 2002) (affirming award of $508,606 in attorneys' fees in a fair housing case in which plaintiffs were awarded a total of $98,777 in damages); *Cowan v. Prudential Ins. Co of Am.,* 935 F.2d 522, 524-25 (2d Cir. 1991) (in employment discrimination case in which damages awarded were $15,000, reversing judgment of $20,000 in attorney's fees and remanding for entry of judgment awarding attorney's fees of $54,012, as well as costs). In so holding, the Supreme Court noted that "[u]nlike most private tort litigants, a civil rights plaintiff seeks to vindicate important civil and constitutional rights that cannot be valued solely in monetary terms." *City of Riverside*, 477 U.S. at 574.

In determining whether the requested attorney's fees are reasonable, courts should be guided by twelve factors known as the *Johnson* factors: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the level of skill required to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) the time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *See Rum Creek Cola Sales, Inc. v. Cuperton*, 31 F.3d 169, 175 (4th Cir. 1994). An analysis of the relevant factors demonstrates that the lodestar fee requested here is reasonable.

      1.   <u>Time and Labor Required</u>

Upon receiving Ms. Mellerson's request for assistance, counsel had to conduct a factual investigation to assess the merits of a case involving four claims based on three civil rights statues, *i.e.* Title VII, the Rehabilitation Act and the ADEA. After counsel entered their appearance, Plaintiff filed several pleadings early in the case, drafted a substantial amount of

written discovery, and engaged in extended mediation efforts. The time and labor demanded of this case was significantly magnified, however, by Defendant's unwillingness to agree to reasonable requests for consent, its repeated attempts to circumvent its discovery obligations, and its inability to provide information necessary to the efficient resolution of the mediation process.

Regarding the Defendant's tactics in motions and discovery, Defendant engaged in conduct that served no purpose but to obstruct Plaintiff's efforts to prosecute this action and to cause Plaintiff's counsel to expend substantial resources. For example:

- At the time counsel entered their appearance in the case, Plaintiff's counsel asked Defendant to withdraw its premature Motion for Summary Judgment, as it was filed before any discovery had occurred and was based almost entirely on a self-serving denial of discriminatory intent. Counsel for Defendant refused, thereby forcing Ms. Mellerson to prepare and file an opposition memorandum and motion under Fed. R. Civ. P. 56(f). This Court denied Defendant's motion and granted Plaintiff's request to take discovery. Docket Entry #23.

- As part of discovery and pursuant to Md. R. Prof. Conduct 4.2, Ms. Mellerson sought interviews with certain lower level non-managerial SSA employees that were believed to have relevant information. *See* Exhibit D; Exhibit E. Out of an abundance of caution and consideration, Plaintiff provided SSA with advance written notice of the individuals that she intended to interview. *See* Exhibit M at 2. Defendant took the position that, regardless of Rule 4.2, the *Touhy* doctrine prohibited *ex parte* communications with all SSA employees. See Exhibit N. After researching this issue, counsel for Ms. Mellerson provided SSA regulations showing that the *Touhy* doctrine did not apply during civil litigation. *See* Exhibit O at note 1. Despite this showing, SSA provided no other grounds for refusing the request to interview these SSA employees and continued to object to such communications. Therefore, Plaintiff was forced to expend time on oral negotiations and written correspondence as well as research to attempt to resolve this dispute.

- In addition, because of Defendant's objections to these permissible interviews, and because the limited four-month discovery period was quickly passing, Ms. Mellerson noted the depositions of some of these lower level non-management employees in addition to the critical higher level employees. Defendant then notified Ms. Mellerson that it would not consent to the taking of depositions in excess of the presumptive ten deposition limit under Rule 30(a)(2)(A) of the Federal Rules of Civil Procedure. *See* Exhibit P. In this way, Defendant sought to prevent Ms. Mellerson from deposing most of these lower level non-management employees and Ms. Mellerson had to file a

Motion for Leave of Court to Take More than Ten Depositions. This motion was pending when Defendant requested mediation and has not been decided.

- Because Ms. Mellerson filed her initial Complaint *pro se* using a one-page form, her counsel sought to file an amended complaint to limit and better define her claims, including voluntarily dismissing her sex discrimination claim and clarifying that her disability claim was solely a "regarded as" claim under the Rehabilitation Act. Defendant refused to consent to the filing of the Amended Complaint, stating that it "doesn't hurt me but doesn't help me" to agree. Defendant's refusal necessitated Ms. Mellerson filing a contested Motion for Leave to File First Amended Complaint. This motion was granted on the day it was filed. Docket Entry #29.

- The SSA refused to provide discoverable information in response to Ms. Mellerson's written discovery requests, in particular evidence of complaints or charges of discrimination against the decision-maker, Mr. Brittingham, as well as his promotion decision-making history. *See* Exhibit B at 2-4; Exhibit A at 5-7; Exhibit H. In fact, Defendant stated that it would instruct Mr. Brittingham during his deposition not to answer any questions regarding complaints against him. *See* Exhibit H. Defendant never provided any authority to support these positions. On the heels of this refusal, Defendant attempted to avoid having to produce this information by requesting mediation and a stay in discovery. Although Plaintiff agreed that no additional discovery would be sought, Plaintiff continued to pursue extant discovery requests that were important to assess the case for mediation, such as the history of discrimination complaints. *See* Exhibit C; Exhibit H; Exhibit P1. Defendant continued to refuse to provide this information. *See* Exhibit Q; Exhibit R. At the first mediation session, this Court stated that mediation could not proceed without such information for Plaintiff to value her case unless SSA was willing to concede liability for purposes of the mediation. The Court also noted the likelihood that Defendant would have to produce such complaints should Plaintiff file a motion to compel. SSA's strategy required counsel for Ms. Mellerson to take numerous steps in an attempt to resolve these disputes and obtain the information. The details of those efforts are accounted for in the billing records as well as the above exhibits.

In each case in which the Court addressed one of the above disputes, Plaintiff prevailed.

In addition, several conversations and meetings were required before SSA was able to explain how it derived the back pay number it was proposing, and Plaintiff was ultimately left to calculate future economic loss on her own. *See* Exhibit S; Exhibit L.

In light of all of the above obstacles, the fees and costs sought in this case are eminently reasonable. As described more fully in the declarations of Susan E. Huhta and Tracey Turner,

attached as Exhibits J and K, Plaintiff's petition for an award of attorneys' fees and costs seeks

$133,979 in attorneys' fees and $3,738 in costs.  In particular, billing judgment was exercised as

follows:

- Fees have not been sought for more than one attorney from the same law firm performing the same function (*e.g.* editing co-counsel's brief).

- Fees have been severely curtailed for time spent by both law firms on a particular task.

- Fees have not been sought for time spent preparing Plaintiff's Motion for Privacy Act Order.

- Fees have not been sought for work performed by Piper Rudnick attorneys Robert P. Rothman, Linda M. Thomas, and Mary E. Gately, and for work performed by Piper Rudnick interns/law clerks.

- Fees have not been sought for the time expended by the Committee on research related to pattern and practice evidence.

- Fees have not been sought for any time expended by the Committee's legal assistant in managing the case file or providing overall administrative support.

- The attorney hours for which fees are not sought but which were expended on the case total 330.57.  The lodestar value of the attorneys' fees for which recovery is not sought totals $89,289.

- The paralegal and intern hours for which fees are not sought but which were expended on the case total 58.48.  The lodestar value of the paralegal and intern fees for which recovery is not sought totals $6,637.

- After reducing the lodestar in the above stated ways, a 20% across the board reduction of the fee total was applied to insure that the fee total represents a truly conservative calculation of the time spent working on this case for which payment is sought, and to insure that the fee petition cannot be criticized for inadvertently including time that is unnecessary or duplicative.

Thus, out of a total lodestar of $263,400, which represents the total time spent by

lawyers, paralegals, and interns, Plaintiff seeks only $133,979.  *See* Exhibit J at ¶¶ 14-15; Exhibit

K at ¶¶ 19-21.  Out of total costs of $4,738, Plaintiff seeks only $3,738.  *See* Exhibit J at ¶ 18;

Exhibit K at ¶¶ 22-23.  These fees are a conservative reflection of the time and labor required to

successfully prosecute the case.  Further, as this Court is aware, the Committee does not have the financial or staff resources to prosecute its cases alone and, therefore, partners on all of its cases with law firms that can bring additional resources to bear on the case.  This is particularly true in cases in which the defendant is a large entity with substantial resources, such as SSA.  Such partnerships necessarily entail coordination of effort, communication between firms regarding events that only one firm was involved in, delegation of responsibilities, and other joint activities.[4]  Moreover, when co-counseling is required in a case, Fed. R. Civ. P. 11 and the Rules of Professional Conduct mandate that both firms stay sufficiently involved to be able to meet their ethical obligations to the client.  Many of these multiple-attorney activities are explicitly permitted by the Local Guideline Appendix B 2.e.  Nevertheless, where appropriate, counsel have exercised considerable billing judgment in limiting fees sought for the involvement of more than one law firm.

In addition, it is well-established in this Circuit that the fees and expenses accrued in connection with the prosecution of the fee petition are recoverable.  *See Ganey v. Garrisson*, 813 F.2d 650, 652 (4th Cir. 1987); *Daly*, 790 F.2d at 1080.  The time spent on this fee petition reflects the care and judgment required by the Local Guideline Appendix B.

2.  Novelty and Difficulty of the Issues

Although this case involved the application of well-established legal principles under Title VII, the ADEA and the Rehabilitation Act, it also entailed application of those principles to a large government agency that has repeatedly come under attack for discriminatory practices.  Defendant employed a deliberate strategy of aggressive and obstructionist tactics that

---

[4]  Nevertheless, this fee petition seeks reimbursement for only one attorney for those activities that explicitly allow reimbursement for only one attorney, such as depositions.

substantially increased the time and expense necessary to prosecute this case.  Defendant's

refusal to consent to a delay in the summary judgment motion or to commonplace filings, such as

a more limited amended complaint, resulted in otherwise unnecessary expenditures of time and

money.  Similarly, although the initial discovery requests were not unusually complex, SSA's

repeated failure to comply with its discovery obligations necessitated Plaintiff spending time and

money on research and correspondence beyond that normally required in these types of

discovery exchanges.  In addition, SSA's destruction of the key promotion file in this case, see

Exhibit A at 2, made the pursuit of other discovery much more urgent, especially in light of the

significant passage of time since the disputed non-promotion.  Finally, although this is an

individual disparate treatment case, the allegations that both the decision-maker at issue and the

agency had engaged in a pattern of discriminatory practices necessitated discovery aimed to

collect pattern and practice evidence as well as evidence directly related to Ms. Mellerson's non-

promotion.  All of these efforts support the award of the fees and expenses requested.

### 3.   Level of Skill Required To Properly Perform the Legal Services

The Committee has existed for thirty-five years in part for the purpose of ensuring that

employers comply with their federal civil rights obligations.  The Committee has obtained

excellent results in this effort.  However, as mentioned above in the Time and Labor section and

as this Court is aware, the Committee must co-counsel with the private bar to vindicate the rights

of victims of discrimination and fulfill Title VII's mandate.  The Committee was fortunate in this

case to secure the assistance of counsel at Piper Rudnick, who practice not only in the

jurisdiction in which this case was filed but also in the locality in which this Court sits.

As described in the declarations of Susan Huhta and Tracey Turner, Plaintiff's counsel

have considerable expertise in the area of civil rights litigation, particularly EEO litigation,

enabling them to spend their time efficiently and without the usual time spent gaining familiarity with a new area of the law.  The Fourth Circuit has placed a premium on civil rights experience in setting hourly rates, reasoning that attorneys who specialize in civil rights litigation work more efficiently on civil rights cases than do attorneys with only general litigation experience.  *See Buffington v. Baltimore County, Md.,* 913 F.2d 113, 129-30 (4th Cir. 1990); *Vaughns v. Board of Education of Prince George's Co.,* 627 F. Supp. 837, 842 and n.10 (D. Md. 1985).

Furthermore, both the Committee and Piper Rudnick consistently employed the work of more junior attorneys, billing at relatively lower rates than the more senior attorneys working on this matter, wherever practicable, and relied on the senior attorneys to perform more supervisory, editing, and oversight responsibilities.  Those junior attorneys also have significant experience in the relevant subject matter.

### 4.  Preclusion of Other Employment

During the prosecution of this case, the Equal Employment Opportunity Project ("the Project") of the Committee, which handled this case, employed approximately five attorneys while receiving approximately 1500 requests from other individuals seeking assistance in EEO related matters.  This case consumed a significant portion of the time of Susan Huhta and Carolyn Weiss, thereby constituting a drain of the Committee's resources throughout the year and a half during which this litigation has been pending.  In addition, because the Project cannot take a large number of cases, this case precluded the Committee from providing *pro bono* assistance to many other individuals who for one reason or another cannot retain other attorneys.

### 5.  Customary Fee For Such Services

Counsel from the Committee are seeking *Laffey* rates for their work on this matter. Counsel from Piper Rudnick are seeking their customary, market rates.  Prevailing parties are

entitled to recover their reasonable attorneys' fees calculated at market rates. *See Daly v. Hill*, 790 F.2d at 1080-81. Moreover, non-profit organizations are viewed no differently than private practitioners in this regard for purposes of awarding attorneys' fees. *See Blum,* 465 U.S. at 894-95, *cited in Thompson v. U.S. Dept. of Housing and Urban Development,* No. MGJ-95-309, 2002 U.S. Dist. LEXIS 23875, 46 (D. Md. Nov. 21, 2002) (citations omitted). The "locality rule" makes the community in which the court sits a principle factor in determining the prevailing market rate. *See Rum Creek Coal Sales, Inc.,* 31 F.3d at 179.

In this case, counsel for Piper Rudnick are in Baltimore, the community in which the Court sits.[5] In the case of private commercial firms, the appropriate fee rate is that "prevailing in the community for similar work," presumptively determined by the firm's "customarily charged rate." *Save Our Cumberland Mountains v. Hodel*, 857 F.2d 1516, 1518 (D.C. Cir. 1988) (*en banc*) (internal quotations omitted). *See also Rum Creek Coal Sales, Inc.,* 31 F.3d at 178-79 (the fact that clients pay the rates and believe them to be reasonable establishes that they are the prevailing market rate for such services); *McDonald v. Armontrout,* 860 F.2d 1456, 1459 (8th Cir. 1988) ("in most cases, billing rates reflect market rates – they provide an efficient and fair short cut for determining the market rate"), *quoting Student Pub. Interest Research Group, Inc., v. AT&T Bell Lab's.*, 842 F.2d 1436, 1445 (3d Cir. 1988); *Bolden v. J&R Inc.*, 135 F. Supp. 2d 177, 179 (D.D.C. 2001) ("[a]n attorney's actual billing rate is presumptively deemed a reasonable rate"); *Shepherd v. ABC,* 862 F. Supp. 505, 507 (D.D.C. 1994) (stating "well-established presumption" that a "lawyer's established billing rate is the best evidence of a

---

[5] The only exception are Sue Temkin and Rita Patel, tax attorneys from Piper Rudnick's D.C. office. Ms. Temkin and Ms. Patel provided expertise and guidance with respect to the taxation of attorney's fees issues and proposed alternatives.

reasonable rate"). Consequently, counsel from Piper Rudnick seek an attorneys' fee calculated according to their customary rates.

In addition, Piper Rudnick's market rates should not be compromised by the fact that the counsel at Piper Rudnick took on this case *pro bono*. As explained by the Seventh Circuit Court of Appeals:

> The market rate of legal time is the opportunity cost of that time, the income foregone by representing this plaintiff. Using opportunity cost as the measure of legal services means that the value of the lawyer's gift inures to the favored cause, and not to the adversary in litigation.

*Gusman v. Unisys Corp.* 986 F.2d 1146, 1149 (7th Cir. 1993). *Accord Save Our Cumberland Mountains, Inc.*, 857 F.2d at 1524 (for-profit attorneys who are willing to sacrifice their typical rates in order to work on a public interest case should not have their rates assessed for fee-shifting purposes based on what they were willing to be compensated for the case).

In support of its requested rate, Plaintiff has attached the declaration of Tracey Turner, a partner at Piper Rudnick, setting forth the actual billing rates and the experience and qualifications of Piper Rudnick attorneys and staff involved in this case. *See* Exhibit K. This declaration establishes the billing rates normally charged by participating Piper Rudnick attorneys, which are the best evidence of the reasonable rate. *See, e.g., Cobell v. Norton*, 231 F. Supp. 2d 295, 302-3 (D.D.C. 2002) (Lamberth, J.) ("One can begin with the premise that, in the ordinary case, a fee based on actual rates an attorney charges will be *prima facie reasonable*. There is no better indication of what the market will bear than what the lawyer in fact charges for his services and what his clients pay") (internal quotation omitted). *See also Gusman v. Unisys Corp.*, 986 F.2d 1146, 1149-50 (7th Cir. 1993) ("When the lawyers sell their time in the market, the market provides the starting point: the lawyer's hourly rate.").

Regarding the *Laffey* rates charged by the Committee's counsel, as stated in the Declaration of Susan E. Huhta, the Committee is a tax-exempt, nonprofit civil rights organization formed pursuant to Section 501(c)(3) of the Internal Revenue Code. *See* Exhibit J at ¶ 2. Therefore, the Committee does not charge its clients a fee for the representation it provides. In lieu of evidence of an actual billing practice, the Committee derives the rates at which it seeks compensation for its staff from a matrix of fees that the U.S. District Court for the District of Columbia has adopted as reflecting the rates prevailing in the District of Columbia. *See Laffey v. Northwest Airlines, Inc.*, 572 F. Supp. 354, 371-75 (D.D.C. 1983); *aff'd* 746 F.2d 4 (D.C. Cir. 1984), *rev'd on other grounds, Save Our Cumberland Mountains v. Hodel*, 857 F.2d 1516 (D.C. Cir. 1988) (*en banc*). *Laffey* rates for attorneys practicing under ten years are very close to those deemed presumptively reasonable under the "Guidelines Regarding Hourly Rates" set forth in the District of Maryland Local Rules at Appendix B(3) and have been repeatedly accepted as the "prevailing market rate" by the federal courts in Washington, D.C. *See, e.g. Blackman et al. v. District of Columbia, et al.,* No. 97-1629, 2000 U.S. Dist. LEXIS 20970, *6-7 and n.1 (Sept. 13, 2000 D.D.C.); *Trout v. Vall*, 705 F. Supp. 705, 709 n.10 (D.D.C. 1989); *see also* Thompson, 2002 U.S. Dist. LEXIS at *35 (recognizing *Laffey* rates as customary in the District of Columbia). In multiple fee petitions, the Committee consistently has sought and obtained *Laffey* Rates for the work it has performed on behalf of prevailing clients. *See, e.g., Bolden v. J & R Inc.,* 135 F. Supp. 2d 177 (D.D.C. 2001).

Moreover, this Court has approved the use of *Laffey* rates in certain circumstances for law firms in Washington, D.C. that take on *pro bono* cases in the District of Maryland. *See* Thompson, 2002 U.S. Dist. LEXIS at *48-51. As in *Thompson*, this matter was not one that would generally attract the private bar. Plaintiff was able to obtain the representation of the

Committee because of the firm's unusual willingness to take on an individual *pro se* case against the federal government that had been filed almost a year before, involved discrimination that had occurred over seven years before, and involved pending motions.

The circumstances outlined in this Memorandum, combined with the experience, reputation and ability of the attorneys involved, support the application of rates requested in this case.

6.  <u>Whether the Fee was Fixed or Contingent</u>

Counsel for Ms. Mellerson accepted this engagement on a *pro bono* basis with the expectation that if Ms. Mellerson were determined to be the prevailing party, that recompense of fees and expenses would be sought from SSA to the full extent permitted under law.  Ms. Mellerson's attorneys have not received any payment to date for services rendered.

7.  <u>Time Limitations Imposed by the Client or the Circumstances</u>

The passage of time presented a challenge in this case in two ways.  First, Ms. Mellerson filed her complaint *pro se* in July 2001 and counsel entered their appearance in May 2002, on the eve of the Court's consideration of Defendant's Motion to Dismiss or for Summary Judgment. Counsel was pressed to learn the case history, assess the current issues and respond to the aforementioned motion in a relatively short period of time, despite an extension of time for the response to the motion.  This expedited effort involved the cooperation and hard work of several attorneys.

Second, this case began with Ms. Mellerson's non-promotion in late 1994 and spent six years in the administrative process, to no fault of Ms. Mellerson.  Therefore, by the time counsel became involved in this case, time was of the essence to locate critical witnesses, to preserve whatever memories these witnesses once had, and to locate documents.  In addition, during

discovery, Defendant informed Plaintiff that the alleged perpetrator, Harold Brittingham, was retiring, creating serious issues regarding access to information and to this key witness. Moreover, Defendant admitted that in 1998 it had "inadvertently sent to storage and destroyed" the 1994 promotion file at issue. *See* Exhibit A at 2.    Thus, the information retained by individuals' memories took on even greater significance.   Consequently, until SSA conceded liability for purposes of the settlement discussions in the first mediation session, Plaintiff had to vigorously pursue discovery not only to be able to value the case for mediation but also to ensure that, should mediation fail, she could re-initiate the case without losing any more time.

### 8. Results Obtained

In awarding attorneys' fees, the Court should consider the significance of Plaintiff's overall success, including the significant public benefits conferred by the outcome of the litigation. *City of Riverside*, 477 U.S. at 574 (recognizing that a successful civil rights plaintiff "often secures important social benefits that are not reflected in nominal or relatively small damages awards"); *see also Hensley,* 461 U.S. at 440 ("the extent of a plaintiff's success is a crucial factor in determining the proper amount of an award of attorneys' fees").   Federal courts frequently consider public benefits in determining an appropriate award of attorneys' fees.   As the Supreme Court has noted, "[A] civil rights plaintiff seeks to vindicate important civil and constitutional rights that cannot be valued solely in monetary terms." *City of Riverside*, 477 U.S. at 574.

Plaintiff was awarded over $46,000, including back pay of over $13,000, compensatory damages exceeding $16,000, and front pay totaling more than $16,000, to compensate her for the remainder of her anticipated lifespan for the economic loss resulting from the non-promotion.   In addition, the Settlement Agreement provides for the separate determination of attorneys' fees,

which ensures that Ms. Mellerson will receive the full benefit of her recovery. The amount of damages is substantial, especially in light of Ms. Mellerson's modest pay, and the fact that this outcome was achieved through settlement rather than a jury verdict. Nevertheless, even modest awards support a full fee award. *See, e.g., City of Riverside*, 477 U.S. at 574-575 (affirming award of attorneys' fees in civil rights case that was approximately seven times the amount of damages awarded); *Thomas v. NFL Players Ass'n*, 273 F.3d 1124, 1129 (D.C. Cir. 2001) (in employment discrimination case affirming award of $338,000 on damages of $73,390); *Williams v. First Government Mortgage and Investors Corp.*, 225 F.3d 738, 743 (D.C. Cir. 2000) (affirming award of $199,340 in fees upon a damages award of $25,200).

Furthermore, Plaintiff's lawsuit sought vindication for herself and peace of mind for others who remain in Defendant's employ. The damages recovered not only compensate Plaintiff for the injuries she endured but, hopefully, will contribute significantly to the deterrence of civil rights violations in the future. *See City of Riverside*, 477 U.S. at 574 (acknowledging the effect of modest damage awards in deterring future civil rights violations and that this deterrent effect may support substantial awards of attorney's fees). This settlement agreement serves as yet another reminder to this agency, as well as other agencies, that civil rights violations will not be tolerated, and to government employees that the vindication of rights is possible even against such formidable defendants. The results obtained therefore fully support Plaintiff's fee petition.

9. Experience, Reputation, and Ability of the Attorneys

The experience of each attorney for whom compensation is sought is described in the declarations attached to this memorandum. The attorneys involved all possess well-deserved excellent reputations for their abilities.

10. "Undesirability" of the Case

Ms. Mellerson filed her case *pro se* and proceeded without counsel for almost ten months before she obtained the Committee's assistance. The Committee and Piper Rudnick agreed to represent Ms. Mellerson despite the various challenges her case presented, including the fact that the case had been initiated *pro se*, the discrimination at issue occurred over seven years before, a dispositive motion was pending, and the case was against a large federal government agency. A case such as this one also is undesirable to most attorneys due to the likelihood that it will yield minimal damages, due to Ms. Mellerson's modest salary and the unavailability of punitive damages against the SSA.

11. Nature and Length of the Attorneys' Professional Relationship with the Clients

Plaintiff's counsel intervened in this *pro se* case as part of the Committee's *pro se* project, which is designed to assist plaintiffs who have resorted to proceeding without counsel and who are substantially disadvantaged by continuing to do so. The *pro se* project rests on the idea that it is better not only for plaintiffs but also for the court system and the administration of justice for individuals to have counsel when challenging civil rights violations, especially in cases of such large defendants. In this spirit, Plaintiff's counsel have zealously represented Plaintiff throughout a year and a half of litigation and protracted mediation. An attorney's commitment to her clients in cases that do not provide significant economic recovery and that are against opponents able to engage in a protracted fight should be encouraged. The nature and length of the counsels' relationship with Plaintiff supports the hourly fees that she has requested in this matter.

12. Awards in Similar Cases

Plaintiff's research has produced only one relevant case in which a fee petition was submitted based on a settlement that was achieved by private counsel after discovery commenced but before trial began. In *Gu v. Hughes STX Corp.*, 127 F. Supp. 2d 751, 754 (D. Md. 2001), an age discrimination case, Defendant made an offer of partial summary judgment for $150,000, consisting of back pay and liquidated damages, the latter of which are not available in this case. The plaintiff accepted this offer and the parties agreed to submit the issues of front pay and attorneys' fees and costs to the judge. *See id.* at 754-755. The court granted the plaintiff $122,484 in attorneys' fees and $9,421 in costs.

District Court of Maryland opinions related to attorneys' fees in cases that went to trial also reflect the reasonableness of Plaintiff's fee request. *See, e.g. Woodard, et al., v. The Cactus Grill, et al.,* Civ. Action No. B.00 CV 1050 (D. Md. DATE) (granting attorneys' fees in the amount of $263,822 and $36,681 in costs in a civil rights case in which the plaintiffs were awarded $37,500 in compensatory and punitive damages) (attached as Exhibit T). Although neither *Gu* nor *Woodard* is identical to the case at bar, they support, along with the other evidence presented, Plaintiff's contention that the rates sought in this case are reasonable.

C.    Plaintiffs' Expenses Are Reasonable.

A prevailing plaintiff is entitled to compensation for reasonable litigation expenses. *Daly,* 790 F.2d at 1076 (quoting 42 U.S.C. § 1988). Plaintiff incurred $4,738 in expenses but now seeks only $3,738 in expenses. These expenses are summarized in Exhibits J and K, and are detailed in exhibits attached thereto.

The declarations of Ms. Huhta and Ms. Turner attest to the necessity of these expenditures in order to adequately prosecute the case. In calculating these expenses, Plaintiff

has adhered to the Local Rule's Guidelines at Appendix B(4).  In addition, Plaintiff has excluded from her request expenses associated with unnecessary or duplicative work.  Therefore, Plaintiff is entitled to a full award of the expenses sought.

III.    CONCLUSION

For the reasons set forth above, Plaintiff Jeanette Mellerson should be awarded full attorneys' fees in the amount of $133,979 and expenses in the amount of $3,738.


Respectfully submitted,


_____
/s/
Tracey Gann Turner (Bar No. 07371)
David W. Stamper (Bar No. 26750)
Amy Beth Leasure (Bar No. 26731)
PIPER RUDNICK LLP
6225 Smith Avenue
Baltimore, Maryland  21209-3600
(410) 580-3000
Facsimile (410) 580-3001

Susan E. Huhta (Bar No. 14547)
Carolyn P. Weiss (Bar No. 15563)
Washington Lawyers' Committee
  for Civil Rights & Urban Affairs
11 Dupont Circle, N.W., Suite 400
Washington, D.C.  20036

Attorneys for Plaintiff,
JEANETTE MELLERSON

Dated: November 17, 2003